# UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF PENNSYLVANIA

REBECCA LEE DIBBLE,   :
           :
      Plaintiff :  No. 3:14-CV-2501
           :
   vs.      :  (Judge Nealon)
           :
CAROLYN W. COLVIN, Acting :
Commissioner of Social Security, :
           :
      Defendant :

**FILED**
**SCRANTON**

MAY 2 4 2016

Per_____
DEPUTY CLERK

## MEMORANDUM

On December 31, 2014, Plaintiff, Rebecca Lee Dibble, filed this instant appeal[1] under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the Social Security Administration ("SSA") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI")[2] under Titles II and XVI of the Social Security Act, 42 U.S.C. § 1461, et seq and U.S.C. § 1381 et seq, respectively.   (Doc. 1).  The parties have fully briefed the appeal.  For the reasons set forth below, the decision of the Commissioner denying Plaintiff's applications for DIB and SSI will be vacated.

---

1. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D. Pa. Local Rule 83.40.1.

2. Supplemental security income is a needs-based program, and eligibility is not limited based on an applicant's date last insured.

## BACKGROUND

Plaintiff protectively filed[3] her applications for DIB and SSI on January 20, 2011, alleging disability beginning on December 4, 2010 due to Bipolar Disorder, Manic Depression, anxiety, Attention Deficit Hyperactivity Disorder ("ADHD"), and Borderline Personality Disorder. (Tr. 11, 426).[4]  The claim was initially denied by the Bureau of Disability Determination ("BDD")[5] on July 13, 2011. (Tr. 11).  On July 26, 2011, Plaintiff filed a written request for a hearing before an administrative law judge. (Tr. 11).  An initial in-person hearing was held on December 4, 2012, and a video-conference hearing was held on April 30, 2013, both of which were held before administrative law judge Edward I. Pitts ("ALJ"), and at which Plaintiff, impartial medical expert Chukwuemeka Efobi, M.D. ("ME"), and impartial vocational expert Linda Vause ("VE") testified. (Tr. 11).  On July 3, 2013, the ALJ issued a decision denying Plaintiff's claims because, as

---

3. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

4. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on December 23, 2014.  (Doc. 7).

5. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

will be explained in more detail infra, Plaintiff could perform a full range of work at all exertional levels. (Tr. 17).

On September 6, 2013, Plaintiff filed a request for review with the Appeals Council. (Tr. 7). On October 29, 2014, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review. (Tr. 1-3). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on December 31, 2014. (Doc. 1). On March 13, 2015, Defendant filed an answer and transcript from the SSA proceedings. (Docs. 8 and 9). Plaintiff filed a brief in support of her complaint on August 10, 2015. (Doc. 12). Defendant filed a brief in opposition on September 10, 2015. (Doc. 13). Plaintiff filed a reply brief on November 10, 2015. (Doc. 16).

Plaintiff was born in the United States on February 23, 1982, and at all times relevant to this matter was considered a "younger individual."[6] (Tr. 421). Plaintiff obtained her GED, and can communicate in English. (Tr. 424, 426). Her

---

6. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1). "Younger person. If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45. See Rule 201.17 in appendix 2." 20 C.F.R. §§ 404.1563(c).

employment records indicate that she previously worked as a babysitter, bartender, waitress, sales associate, and a telemarketer. (Tr. 437). The records of the SSA reveal that Plaintiff had earnings in the years 1998 and 2001 through 2010. (Tr. 279). Her annual earnings range from a low of no earnings in 1999 and 2000 to a high of nineteen thousand one hundred eleven dollars and twenty-six cents ($19,111.26). (Tr. 279). Her total earnings during those twelve (12) years were sixty-eight thousand five hundred fifty-six dollars and seventy-five cents ($68,556.75). (Tr. 277).

In a document entitled "Function Report - Adult" filed with the SSA on March 1, 2011, Plaintiff indicated that she lived in an apartment with friends. (Tr. 450). From the time she woke up to the time she went to bed, if she were not in what she described as a "low," she took her medicine, got dressed and showered if not in a "low" period, cleaned, watched television, and talked or visited with family or friends. (Tr. 450). If she were in a low period, she did not get out of bed. (Tr. 450). If she were not in a "low," she was able to prepare meals daily, perform light house cleaning, and do the laundry. (Tr. 452). She also would shop for groceries when someone could take her and when she felt well enough to go out. (Tr. 453). She was able to walk four (4) or five (5) blocks before needing to rest for a minute or two (2). (Tr. 455). She had difficulty sleeping due to racing

4

thoughts and the "highs" that came along with Bipolar Disorder. (Tr. 451). Before her illness, injuries or conditions, she maintained a job, had full use of her right hand, was able to focus, and was able to better take care of herself and her daughter. (Tr. 451). When asked to check items which his "illnesses, injuries, or conditions affect," Plaintiff did <u>not</u> check lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, or seeing. (Tr. 455).

Regarding her concentration and memory, Plaintiff needed special reminders to take care of her personal needs, to take her medicine, and to attend appointments. (Tr. 452). She could count change and handle a savings account, but could not pay bills or use a checkbook because she tended to overdraft her account. (Tr. 453). Her ability to handle money had changed since her illnesses began because she was not organized enough and because if she were on a "high," she would over-shop and not pay bills. (Tr. 454). She could pay attention for fifteen (15) to thirty (30) minutes, could not finish what she started, and followed written instructions well, but did not follow spoken instructions well because she was easily distracted, forgetful, unable to concentrate, and had to be reminded and retold what to do. (Tr. 455). She also did not handle stress or changes in routine well because of anxiety attacks and her forgetfulness. (Tr. 456).

Socially, Plaintiff went out when she "had to and if [she was] motivated."

5

(Tr. 453).  She did not drive because she lost her license due to the "inability to drive safely," but was able to go out alone.  (Tr. 453).  Her hobbies included listening to music and watching television.  (Tr. 454).  She spent time with others, and engaged in activities such as shopping, cleaning, watching television, and riding in a car with others.  (Tr. 454).  She had problems getting along with others, stating, "If I get in a low, family and friends are unable to handle it because it often causes me to black out and I don't know what I'm doing and ends with me being hospitalized.  I'm unable to keep stability."  (Tr. 455).  Since her illnesses began, she noted a lack of interest in social activities, an inability to get out of bed when in a "low," and the inability to be around "a lot of people in public places due to anxiety."  (Tr. 455).  When asked whether she had ever been fired from a job because of problems getting along with others, Plaintiff noted that she had "blacked out and said and done things [that she] didn't know at the time and wouldn't normally do in the right state of mind."  (Tr. 456).

At her initial, in-person hearing held on December 4, 2012, Plaintiff testified that she was disabled due to a combination of depression, racing thoughts, paranoia, an inability to sleep, and anxiety.  (Tr. 82).  She testified that she was unable to maintain employment because she would have anxiety attacks and miss work due to insomnia.  (Tr. 93).  She stated that she last drank in August of 2012

6

after she delivered her baby to celebrate, which was a violation of her probation conditions. (Tr. 80-90). She stayed home to take care of her infant son, aside from Sundays when the child's aunt would watch him. (Tr. 101). In order to allow for more time to obtain additional records and for Plaintiff to undergo a psychiatric examination ordered by the ALJ, a second video conference hearing was scheduled due to Plaintiff's issues with transportation. (Tr. 104-106).

At the second, video-conference hearing held on April 30, 2013, Plaintiff testified that she had remained sober since her last hearing, with proof being that she was on probation and was subject to random drug and alcohol testing. (Tr. 35-36). Her one (1) visit to the emergency room was due to sciatica pain, and she was prescribed Flexeril and Percocet for three (3) days to help with the pain. (Tr. 36). In terms of her mood, she stated that since the last hearing, she had been in a "manic low" that caused in inability to get out of bed. (Tr. 37). Her boyfriend took care of her baby during this time, and she needed to be reminded to take her medicine, shower, brush her teeth, get housework done, and to attend appointments. (Tr. 37). Her boyfriend also helped watch for signs that Plaintiff was going to start cutting or was having suicidal ideations. (Tr. 38).

## MEDICAL RECORDS

On December 13, 2010, Plaintiff had an appointment with Sampath

7

Neerukonda, M.D., at Western New York Med-Psych, PLLC. (Tr. 644). Plaintiff "carrie[d] the diagnosis of bipolar disorder, mixed, and post traumatic stress disorder." (Tr. 644). Plaintiff reported that she had not been doing well, but had been sleeping well due to a recent increase in her Seroquel dosage. (Tr. 644). Her mental status examination revealed that she: was awake, alert, and responsive; was oriented to place, person, and time; had coherent, logical, and relevant speech; had no loosening of associations or flight of idea; had a depressed mood and anxious affect; did not present with paranoia or suicidal thoughts; and had fair cognition. (Tr. 644). Her medications, including Adderall, Wellbutrin, Cogentin, Seroquel, and Celexa, were adjusted, and she was scheduled for a follow-up in six (6) weeks. (Tr. 644).

On January 30, 2011, Plaintiff was brought to the emergency room by police officers due to "self-injurious behaviors in the context of significant intoxication." (Tr. 607, 650). It was noted that she had been drinking in excessive amounts, fighting with her boyfriend, and cutting herself. (Tr. 650). Her diagnoses included resolved alcohol intoxication; alcohol use disorder; cocaine dependence, reported five (5) year sustained remission; ADHD, combined type, reportedly; chronic major depression; borderline personality disorder, unremarkable at this time; current psychological stressors of a moderate degree; and current Global

8

Assessment Functioning ("GAF") score of sixty-five (65). (Tr. 651). Plaintiff acknowledged that her behavior was due to being intoxicated. (Tr. 651).

On February 3, 2011, Plaintiff went to the emergency room due to chest pain, anxiety, dyspnea, and shortness of breath. (Tr. 619). She admitted to drinking half a bottle of tequila. (Tr. 621).

On February 25, 2011, Plaintiff was admitted to the hospital for a Seroquel overdose. (Tr. 701, 704). Plaintiff was intubated, and upon discharge on February 27, 2011, was transferred to the psychiatric facility at DuBois Regional Medical Center. (Tr. 701, 702).

On March 26, 2011, Plaintiff was admitted to the hospital for a second Seroquel overdose. (Tr. 665). It was noted that this overdose was a "probably intention Seroquel overdose." (Tr. 668). Plaintiff was intubated, and was eventually discharged on March 28, 2011. (Tr. 668).

On May 16, 2011, Plaintiff had a first-time appointment with Julie M. Miller, PA-C, a physician's assistant, ("PA Miller"). (Tr. 949-51). Plaintiff had been off her medications since May 5, 2011, and stated she felt manic, did not drink alcohol on a regular basis, and had never used drugs (Tr. 949-950).

On June 3, 2011, Plaintiff had a follow-up appointment with PA Miller. (Tr. 943-44). Plaintiff stated that she was in the process of applying to college,

looking for apartments, and applying for student loans, but that she was unable to complete these tasks due to ADHD. (Tr. 943). As a result, she requested an increase in Adderall, a request that was refused by PA Miller. (Tr. 943).

On August 6, 2011, after lacerating her left thigh while intoxicated, Plaintiff went to the emergency room. (Tr. 758). She stated that the laceration was not a suicide attempt. (Tr. 758). She blamed her current hospitalization on alcohol, and acknowledged that she was in the hospital due to alcohol, and stated that she lost custody of her minor daughter due to drug use. (Tr. 769). She was admitted on a petition for involuntary hospitalization. (Tr. 747). Upon discharge on August 16, 2011, she had a "normalized" mood with no evidence of irritability, mood swings, or suicidal or homicidal ideations. (Tr. 759). Upon discharge, her Axis I diagnosis included adjustment disorder with mixed disturbance of emotion and conduct, resolved, and alcohol intoxication, resolved; her Axis II diagnosis was Cluster B personality traits (Borderline Personality Disorder); and her GAF was a fifty (50). (Tr. 758).

On August 22, 2011, Plaintiff had a follow-up appointment with PA Miller after her recent hospitalization. (Tr. 938-39). Plaintiff reported that she felt better since her discharge, was taking her medications as prescribed, did not have thoughts of injuring herself or others, was not drinking alcohol, and was "getting

10

her life back on track." (Tr. 938). She felt she was on a stable dose of medications, and had not been experiencing any episodes of severe depression or racing thoughts (Tr. 939).

On February 14, 2012, Plaintiff had an appointment at Laurel Behavioral Health with Lori A. Makos, MSW, a social worker. (Tr. 1004-1006). Plaintiff's primary concerns were depression, anxiety, and being unable to sleep. (Tr. 1004). She was not on medications, used cutting as a coping skill, and fired her psychiatrist recently. (Tr. 1004). She admitted to monthly alcohol use, cocaine use in 2007, and THC use in August of 2011. (Tr. 1005). Her exam revealed a normal appearance, orientation in three (3) spheres, pressured speech, normal eye contact, cooperative behavior, intact recent and remote memory, and normal psychomotor movements, a depressed mood, concrete reasoning, normal thought content and perceptions, loose associations, poor insight and judgment, full affect range, and no suicidal or homicidal ideations. (Tr. 1005-1006). Her Axis I diagnosis was Depressive Disorder, her Axis II diagnosis was Borderline Personality Disorder, and her GAF was fifty-five (55). (Tr. 1006). She was scheduled for a follow-up in one (1) week. (Tr. 1006).

On March 15, 2012, Plaintiff had an appointment with Dr. Shapiro at Concern Counseling Services due to complaints of being very depressed and an

inability to stay focused. (Tr. 988). Her Axis I diagnosis was Bipolar Disorder, her Axis II diagnosis was Borderline Personality Disorder, and her GAF was a fifty (50). (Tr. 988-989).

On March 23, 2012, Plaintiff, during her twenty-seventh (27th) week of pregnancy, presented in the emergency room with complaints of back pain (Tr. 797-803). She was prescribed Tylenol with Codeine. (Tr. 799).

On July 23, 2012, five (5) weeks after giving birth, Plaintiff presented to the emergency room in an intoxicated state. (Tr. 811). She reported that she had ingested five (5) shots of alcohol, had an altercation with her boyfriend, called the police, and was discharged to jail for violating her probation. (Tr. 819, 821). Her mental status examination revealed she: had inappropriate affect; had excessive, pressured, and soft speech; had intense eye contact; was restless; had indecisive flow of thought; had visual hallucinations, thoughts of harm, and ideas of hopelessness; was alert and oriented in three (3) spheres; had fair comprehension; had an anxious mood; and was uncooperative. (Tr. 823). Her diagnoses included alcohol intoxication, depression, and lifestyle/substance problems. (Tr. 814, 818).

On August 9, 2012, Plaintiff told Lori A. Makos, MSW, a social worker, that her son's father took him after he found her highly intoxicated, and that the police arrested her for violating probation. (Tr. 998). Her Axis I diagnoses

12

included Bipolar Disorder and Anxiety, her Axis II diagnosis was Borderline
Personality Disorder, and her GAF was a fifty-five (55). (Tr. 1008).

On September 14, 2012, Plaintiff had an appointment with Stephanie King
at Concern Counseling Services for medication management. (Tr. 990). She
reported that everything was ok, and that the Seroquel XR had not worked as well
as the regular Seroquel. (Tr. 990). Her medications were adjusted, and she was
scheduled for a follow-up visit. (Tr. 990).

On September 28, 2012, Plaintiff had an appointment with Nita Hartman at
Concern Counseling Services for medication management. (Tr. 1012). She
reported she was doing much better, felt that the Cymbalta was helping, and that
her depression and anxiety were much less severe. (Tr. 1012). Her mood was
euthymic, her affect was appropriate, her eye contact was good, she was pleasant
and cooperative, her thoughts were logical and goal-directed, her hygiene was
appropriate, her speech was spontaneous and relevant, and there was no evidence
of delusions, perceptual disturbances, or suicidal or homicidal ideations. (Tr.
1012). Her Axis I diagnosis was Bipolar Disorder, her Axis II diagnosis was
Borderline Personality Disorder, and her GAF was a fifty-three (53). (Tr. 1012).

On September 28, 2012, nurse practitioner Stephanie King opined that
Plaintiff was permanently disabled due to Major Depressive Disorder and Anxiety

Disorder.  (Tr. 1018).

On October 18, 2012, Plaintiff had an appointment with nurse practitioner
Nita Hartman.  (Tr. 1010).  It was noted that Plaintiff continued to have mood
instability, that she had frequent and extreme breakthrough lows at "the drop of a
hat," that she cried uncontrollably and had angry and violent outbursts, and that
she had thoughts of hopelessness and self-harm.  (Tr. 1010).  She noted that the
Cymbalta seemed to be helping with depression, but that her moods were "all over
the place."  (Tr. 1010).  She noted that she continued to have lack of motivation to
complete even basic tasks and had to force herself sometimes to take a shower.
(Tr. 1010).  Her affect was tearful, her mood was depressed, her eye contact was
good, her hygiene was appropriate, her thoughts were logical and goal-directed,
her speech was spontaneous and relevant, she was calm and cooperative but
tearful, her insight and judgment were fair, and there were no delusions,
perceptual disturbances, or suicidal or homicidal ideations.  (Tr. 1010).  Her Axis I
diagnosis was Bipolar Disorder, her Axis II diagnosis was Borderline Personality
Disorder, and her GAF was a fifty-three (53).  (Tr. 1010).

On November 30, 2012, Plaintiff had an appointment with Stephanie King,
a nurse practitioner, for a medication check.  (Tr. 1071).  Plaintiff noted she had
been having some difficulty sleeping.  (Tr. 1071).  Her affect was flat and her

14

mood was depressed, but she was engaged in the session. (Tr. 1071).  Her

Seroquel dose was increased, and she was instructed to continue taking the

Adderall, Cymbalta, and Ativan as prescribed. (Tr. 1071).

On December 11, 2012, a Treating Physician/ Source Statement was

completed by Dr. Jon Grigg and nurse practitioner Stephanie King. (Tr. 1019).  It

was stated that the following impairments impacted Plaintiff's ability to work:

Major Depressive Disorder, Recurrent; Bipolar Disorder; and Borderline

Personality Disorder. (Tr. 1019).  It was stated that, "[Plaintiff] experiences

significantly disabilitating [sic] mood swings.  She experiences depressive stages

where it is difficulty for her to even complete activities of daily living." (Tr.

1019).  In terms of understanding, carrying out, and remembering simple

instructions, it was opined that Plaintiff: (1) had extreme difficulty in focusing for

any length of time that affected her ability to remember work-like procedures; (2)

required that each task be broken down into individual elements in order to

understand and remember very short and simple instructions; (3) would need

"frequent cueing" in order to carry out very short and simple instructions; (4)

would require frequent "cueing and reminders - as much and as frequent as every

15 minutes;" (5) would have difficulty maintaining regular attendance and

punctuality within customary tolerances, especially "when having a resurgence of

15

depressive symptoms;" (6) would have a limited ability to perform activities

within a schedule within customary tolerances because she needed to be able to

"manage time which is difficult due to racing, scattered thoughts;" (7) was limited

in her ability to sustain an ordinary routine "again due to scattered, disorganized

thoughts during manic phases and lack of maturation or ambition during

depressive phases;" (8) was limited in her ability to interact with supervisors and

co-workers without interruptions from physically or psychologically based

symptoms and without being unduly distracted because "when in a manic phase,

she is angered easily and has become both verbally and physically disruptive;" (9)

would have difficulty in the ability to work near co-workers without being unduly

distracted or without interruptions from physically or psychologically based

symptoms because being around others caused Plaintiff to experience extreme

anxiety and paranoia that others were plotting or talking about her; (10) would be

limited in her ability to receive direction or criticism from supervisors or co-

workers without interruptions from physically or psychologically based symptoms

and without being unduly distracted due to the fact that she was easily irritated and

angered if criticized; (11) was incapable of a consistent work pace and therefore

limited in her ability to complete a normal workday and workweek without

interruptions from physically or psychologically based symptoms and to perform

at a consistent pace without an unreasonable number and length of rest periods; (12) would have to be given the freedom to "walk away from any stress, anxiety, or anger inducing situations in order to prevent aggressive outbursts," which could occur as many as two (2) to three (3) times per hour; and (13) was likely to miss fifteen (15) to twenty (20) days of work as a result of her conditions. (Tr. 1019-1021). It was also noted that Plaintiff experienced the following symptoms as a result of her mental health impairments: frequent anhedonia; periodic appetite disturbance; frequent sleep disturbance; a complete lack of energy when in a depressive phase; feelings of worthlessness or guilty two (2) to three (3) weeks of a depressive phase each month; extreme difficulty concentrating or thinking during the week of a manic phase; thoughts of suicide during extreme lows of a depressive phase; social paranoid thinking; pressure speech; flight of ideas; a decreased need for sleep during a manic phase; and being easily distracted during a manic phase. (Tr. 1021-1023). It was lastly opined that Plaintiff had: (1) marked restrictions in activities of daily living due to a decreased motivation and energy levels during a depressive phase; (2) marked difficulties in maintaining social function; (3) marked difficulties in maintaining concentration, persistence, or pace; and (4) frequent repeated episodes of decompensation. (Tr. 1023-1024).

On February 24, 2013, Chukwuemeka Efobi, M.D., a psychiatrist,

responded to interrogatories submitted to him by the ALJ. (Tr. 236, 257, 1065).

Dr. Efobi was asked to comment on the effect Plaintiff's alcohol abuse had on her

psychological condition and to address whether Plaintiff would continue to have

psychological problems in the absence of substance abuse. (Tr. 1065). It was

noted by Dr. Efobi that Plaintiff had a personality disorder and an underlying

mood disorder that were complicated by chronic alcohol use. (Tr. 1070). Dr.

Efobi also noted that most of Plaintiff's emergency room visits and

hospitalizations were in the context of alcohol intoxication, with a few visits due

to borderline personality self-injurious behavior. (Tr. 1066). Dr. Efobi analyzed

Plaintiff's mental health impairments under Listings 12.04, Affective Disorders;

12.06, Anxiety disorders; 12.08, Borderline Personality Disorder; and 12.09,

Polysubstance Dependence. (Tr. 1068). Dr. Efobi opined that Plaintiff had

moderate to marked restriction of activities of daily living; moderate to marked

difficulties in maintaining concentration, persistence, or pace; and more than five

(5) episodes of decompensation, such that her impairments equaled an Impairment

Listing. (Tr. 1067-68). Dr. Efobi stated that he could not make out a clear period

of sobriety where Plaintiff's mood symptoms were present and severe enough to

markedly limit her function, and concluded that "[i]n the absence of substance

abuse, the underlying mood and personality disorders would still exist but possibly

at a mild form, with more extended periods of stability with constant treatment." (Tr. 1070).

On March 18, 2013, Plaintiff had an appointment with Sandra Brill, nurse practitioner, for medication management. (Tr. 1072). Plaintiff underwent a mental status examination, which revealed that her speech was normal in pace and tone; her thought process was linear and goal directed; she denied abnormal/psychotic thoughts; her judgment and insight were fair; she was oriented in all three (3) spheres; her attention and concentration were focused; and her mood and affect were euthymic. (Tr. 1072). It was also noted that Plaintiff had enrolled in college, and was living in a busy household.  (Tr. 1072).

On April 12, 2013, Plaintiff presented to the emergency room for back pain due to a motor vehicle accident that occurred two (2) days earlier. (Tr. 1075-1085, 1100, 1110). It was noted that Plaintiff was alert and oriented in all three (3) spheres with no motor or sensory deficits. (Tr. 1078). Plaintiff responded that she had not recently felt down, depressed, or hopeless, did not have suicidal or homicidal thoughts. (Tr. 1080).

On April 30, 2013, Dr. Efobi testified that Plaintiff had a personality disorder and a baseline mood disorder that were severe enough to equal a listed impairment due to alcohol dependence; however, Dr. Efobi further stated that

Plaintiff would not meet or equal the severity of a listed impairment without the presence of alcohol. (Tr. 41). Dr. Efobi testified that Plaintiff would have mild restriction of activities of daily living, moderate restrictions in social functioning, and mild restrictions in concentration, persistence, or pace if Plaintiff were substance free long enough for the effects of alcohol and/ or drugs to be out of her system. (Tr. 51). Dr. Efobi stated that "most of the restrictions she would have [in terms of reporting to work] would be due to the alcohol" (Tr. 51-52). Dr. Efobi also stated, "[b]ecause of the frequen[cy] of the ER visits and the frequent decompensations are all alcohol related[,] without the alcohol[,] I think she should be able to maintain attendance." (Tr. 52). Dr. Efobi noted that Plaintiff went to the emergency room on March 26, 2011, due to a pill and alcohol overdose, after he was questioned whether Plaintiff was terminated from a job after being absent on March 26, 28 and 29 of 2011. (Tr. 52-53). Dr. Efobi stated that Plaintiff's most significant symptoms coincided with the times she was consuming alcohol. (Tr. 54). Dr. Efobi testified that Plaintiff's four (4) to five (5) periods of decompensation were "mostly alcohol related." (Tr. 54).

On May 3, 2013, Plaintiff had an appointment with Gregory Thorkelson, M.D., for medication management. (Tr. 1094). Plaintiff noted that her mood had "improved," that she was attending college, that she had an increased ability to

20

concentrate, and that she was able to get her license back. (Tr. 1094).  She had also  recently taken two (2) trips to see her family. (Tr. 1094).  She noted that she had previously been very depressed, with multiple suicide attempts and self-injurious behavior in the past. (Tr. 1094).  She also stated that she felt very depressed prior to medication increases. (Tr. 1094).  Plaintiff underwent a mental status examination, which revealed that Plaintiff was alert and cooperative, and that she appeared clean and casually dressed. (Tr. 1095).  No abnormal movements or psychomotor agitation were observed; her speech rate, tone, volume, latency, and articulation were within normal limits; her mood was good; her affect was congruent and labile; she was tearful at times; she had the equivalent of a small panic attack during the session; she was oriented to person, place, and time; her memory was intact; her attention and concentration were intact; her thought form was logical and linear; she denied suicidal ideation, homicidal ideation, self-injurious thoughts, self-injurious behaviors, paranoid delusions, and obsessions and compulsions; she endorsed impulsivity intermittently; she denied auditory or visual hallucinations; her insight was fair; and her judgment was poor. (Tr. 1095).  Plaintiff's medications were adjusted by Dr. Thorkelson. (Tr. 1095).

On May 20, 2013, Plaintiff had a follow-up appointment with Dr.

21

Thorkelson. (Tr. 1098).  Plaintiff told Dr. Thorkelson that she was doing generally well with good academic performance, maintaining an "A" average, that her mood was stable and improved, that she had not had any panic attacks since her last visit, that she had no urges to engage in self-injurious behavior, that she had no suicidal ideation, that she had no emergent mania, that she endorsed intermittent racing thoughts that she described as tolerable, that she was able to focus and complete tasks even with medication changes, that she specifically denied active or recent substance abuse, and that she had no urges to relapse. (Tr. 1087).  A mental status examination revealed that she was alert and cooperative, and appeared clean and casually dressed. (Tr. 1090).  No abnormal movements or psychomotor agitation were observed; her speech rate, tone, volume, latency and articulation were within normal limits; her mood was good; her affect was congruent and full; she was oriented to person, place, and time; her memory was intact; her attention and concentration were intact; her thought form was logical and linear; she denied suicidal ideation, homicidal ideation, self-injurious thoughts, self-injurious behaviors, paranoid delusions, impulsivity, and obsessions or compulsions; she denied auditory or visual hallucinations; and her insight and judgment were fair. (Tr. 1090).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner.  See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).  Factual findings which are supported by substantial evidence must be upheld.  42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of

evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the

reasons for rejecting certain evidence.  <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d

at 706-07.  Therefore, a court reviewing the decision of the Commissioner must

scrutinize the record as a whole.  <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir.

1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, including supplemental security income, the

plaintiff must demonstrate an "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. §

432(d)(1)(A).  Further,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether
> a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.  For purposes of the preceding
> sentence (with respect to any individual), "work which exists in
> the national economy" means work which exists in significant
> numbers either in the region where such individual lives or in
> several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits.  See 20 C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy.  Id.  As part of step four, the Commissioner must determine the claimant's residual functional capacity.  Id.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.  Id.  "The claimant bears the ultimate burden of establishing steps one through four."  Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996).  A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule.  The residual functional capacity assessment must include a discussion of the individual's abilities.  Id.; 20 C.F.R. §§ 404.1545 and 416.945;

26

Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

"At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity. " Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004).

## ALJ DECISION

Initially, the ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through the date last insured of June 30, 2015. (Tr. 13). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity from her alleged onset date of December 4, 2010. (Tr. 13).

At step two, the ALJ determined that Plaintiff suffered from the severe[7]

---

7. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An impairment or combination of impairments is "not severe" when medical and other

combination of impairments of the following: "bipolar disorder and poly-substance abuse in early remission (20 C.F.R. 404.1520(c) and 416.920(c))." (Tr. 13).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). (Tr. 15-17).

At step four, the ALJ determined that Plaintiff had the RFC to perform a full range of work with limitations. (Tr. 17). Specifically, the ALJ stated the following:

> After careful consideration of the entire record, I find that [Plaintiff] has the [RFC] to perform a full range of work at all exertional levels. She is limited to unskilled work that is generally routine in nature. Also due to the symptoms of her bipolar disorder, she should have only occasional social contact with supervisors, coworkers, and the general public.

(Tr. 17).

At step five of the sequential evaluation process, because Plaintiff could not perform any past relevant work, and considering the her age, education, work

---

evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

experience, and RFC, the ALJ determined "there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform (20 C.F.R. 404.1569, 404.1569(a), 416.969 and 416.969(a))." (Tr. 19).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time between December 4, 2010, the alleged onset date, and the date of the ALJ's decision. (Tr. 20).

## DISCUSSION

On appeal, the crux of Plaintiff's argument is that, in arriving at the conclusion that alcohol and substance abuse was a material factor contributing to Plaintiff's conditions, the ALJ failed to support this conclusion with concrete medical evidence because Dr. Efobi's opinion was based on speculation, as he stated, ""[i]n the absence of substance abuse, the underlying mood and personality disorders would still exist but possibly at a mild form, with more extended periods of stability with constant treatment." (Tr. 1070). (Doc. 12, p. 4-8). Furthermore, Plaintiff asserts that the ALJ erred in failing to distinguish and isolate Plaintiff's substance abuse from the underlying impairment from the diagnosed Borderline Personality Disorder, a distinction that is crucial to the disability determination at hand because of the fact that substance abuse is a component of Borderline Personality Disorder. (Id.).

Upon first glance of the ALJ's decision, it appears that the ALJ followed the proper procedure in terms of addressing whether Plaintiff's substance abuse was a contributing factor material to the determination her disability in accordance with the "Contract with American Advancement Act of 1996," Pub. L. No. 104-121, § 105, 110 Stat. 847 (1996), amending 42 U.S.C. §§ 423(d)(2)( C), 1382a(3)(J). The ALJ called upon a medical expert, namely Dr. Efobi, who testified that Plaintiff's impairments would possibly be milder were substance abuse taken out of the equation.  Based on Dr. Efobi's testimony that absent substance abuse, Plaintiff would not meet the severity level required to meet any of the aforementioned Listings, the ALJ concluded that the substance abuse was a contributing factor material to the determination of disability, and that Plaintiff was therefore not disabled.  <u>See</u> 20 C.F.R. §§ 404.1535, 416.935.

However, despite following this aforementioned procedure properly, it is unclear as to whether the ALJ considered all of the evidence in the case, given the fact that, in Step Three of the Sequential Evaluation Process, the ALJ lumps all of Plaintiff's psychological impairments, including Borderline Personality Disorder, under the heading of Bipolar Disorder.  (Tr. 14).  However, it is well-known that Bipolar Disorder and Borderline Personality Disorder are two (2) entirely separate diagnoses, as evidenced by their descriptions in the Diagnostic and Statistical

Manual of Mental Disorders (DSM-IV-TR) 32 (4th ed. 2000) ("DSM-IV").[8]

In <u>Fargnoli v. Halter</u>, 247 F.3d 34, 42 (3d Cir. 2001), the United States

Court of Appeals for the Third Circuit held that, "[w]here there is conflicting

probative evidence in the record, we recognize a particularly acute need for an

---

8. The Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 32 (4th ed. 2000) ("DSM-IV") defines a personality disorder as an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture, is pervasive and inflexible, has an onset in adolescence or early adulthood, is stable over time, and leads to distress or impairment. (DSM-IV at 685.) There are ten specific personality disorders, including borderline personality disorder. <u>Id.</u> According to the DSM-IV, personality disorders are assessed on Axis II and are grouped into three clusters based on descriptive similarities. <u>Id.</u> at 28-29, 685-86. Borderline personality disorder is a Cluster B personality disorder. <u>Id.</u> The diagnostic criteria for borderline personality disorder are: [A] pervasive pattern of instability of interpersonal relationships, self-image, and affects, and marked impulsivity beginning by early adulthood and present in a variety of contexts, as indicated by five (or more) of the following: (1) frantic efforts to avoid real or imagined abandonment; (2) a pattern of unstable and intense interpersonal relationships characterized by alternating between extremes of idealization and devaluation; (3) identity disturbance: markedly and persistently unstable self-image or sense of self; (4) impulsivity in at least two areas that are potentially self-damaging (e.g., spending, sex, substance abuse, reckless driving, binge eating); (5) recurrent suicidal behavior, gestures, or threats, or self-mutilating behavior; (6) affective instability due to a marked reactivity of mood (e.g., intense episodic dysphoria, irritability, or anxiety usually lasting a few hours and only rarely more than a few days); (7) chronic feelings of emptiness; (8) inappropriate, intense anger or difficulty controlling anger (e.g., frequent displays of temper, constant anger, recurrent physical fights); [or] (9) transient, stress-related paranoid ideation or severe disassociative symptoms. <u>Id.</u> at 710. By contrast, the DSM-IV characterizes Bipolar Disorder as a mood disorder comprised of four (4) different types of episodes: (1) Mania; (2) Hypomania; (3) Depression; and (4) Mixed, each presenting with different symptoms and criteria.

explanation of the reasoning behind the ALJ's conclusions, and will vacate or remand a case where such an explanation is not provided." See also Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981) (the ALJ has the duty to provide an explanation as to why evidence was rejected, and "[i]n the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored."). Because the ALJ lumped all of Plaintiff's psychological impairments under Bipolar Disorder, it is impossible for this Court to determine whether the ALJ accounted for and considered Plaintiff's Borderline Personality Disorder as a separate disorder with its own set of symptoms and, more importantly, impossible for this Court to decipher whether the ALJ considered Plaintiff's substance abuse to be a contributing factor material to the determination of disability in the face of solely the Bipolar Disorder, or also in the context of Borderline Personality Disorder. The ALJ's failure to discuss the conflicting probative evidence of Plaintiff's Borderline Personality Disorder that appears repeatedly throughout the record as a diagnosis separate from Bipolar Disorder, (Tr. 651, 758, 988-989, 1006, 1008, 1010, 1012, 1019, 1068, 1070), and the ALJ's failure to discuss the conflicting probative evidence provided by Dr. Efobi's testimony that it was it was possible that Plaintiff was self-medicating with substances and that her substance abuse was possibly a symptom of Borderline

Personality Disorder, (Tr. 53), makes it impossible for this Court to determine

whether substantial evidence supports the ALJ's decision that substance abuse was

a contributing factor material to the determination of Plaintiff's disability resulting

from Borderline Personality Disorder. See Willingham v. Astrue, 2010 U.S. Dist.

LEXIS 14217, at * 24-25 (E.D. Pa. Jan. 8, 2010) ("In the present case, this

analysis is impacted by ALJ's apparent failure to consider personality disorder in

her decision. It is unclear from her decision if the ALJ considered borderline

personality disorder in the materiality determination. The ALJ's failure to

properly consider the evidence regarding a diagnosis of personality disorder

impacted, or may impact, the ALJ's analysis of the materiality determination under

20 C.F.R. § 416.935. The court cannot determine if the ALJ considered borderline

personality disorder as a limitation which would remain in the absence of

substance abuse."), report and recommendation adopted, Willingham v. Astrue,

2010 U.S. Dist. LEXIS 14222 (E.D. Pa. Feb. 15, 2010).

Furthermore, the rationalizations provided by Defendant in support of the

ALJ's decision that Plaintiff was able to function in the absence of using

substances are post-hoc rationalizations as they were not discussed by the ALJ in

his opinion. (Doc. 13, pp. 19-25). It is well-established that, in reviewing an

administrative law judge's decision, the District Court cannot supply its own

reasons to explain or support the administrative law judge's decision. Fargnoli v. Massanari, 247 F.3d 34, 44 n.7 (3d Cir. 2001). Rather, the District Court is permitted to analyze only those explanations that the administrative law judge actually provides for in his decision. Id. "In the absence of such an [explanation], the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." Burnett, 220 F.3d at 121. As such, this Court is not permitted to review these explanations provided by Defendant in support of the ALJ's decision.

It is noted that, in considering the aforementioned conflicting probative evidence regarding Plaintiff's Borderline Personality Disorder, the ALJ may very well reach the same conclusion. However, in accordance with the Third Circuit precedent established in Fargnoli v. Halter, this Court cannot satisfy its obligation to determine whether substantial evidence supports the ALJ's decision in the absence of an indication that the ALJ considered all of the probative evidence, including Plaintiff's Borderline Personality Disorder and whether it was a contributing factor material to the determination of disability. As such, remand is warranted, and Plaintiff's remaining assertions will not be addressed.

## CONCLUSION

Based upon a thorough review of the evidence of record, it is determined

that the Commissioner's decision is not supported by substantial evidence.

Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be granted, the decision

of the Commissioner will be vacated, and the matter will be remanded to the

Commissioner for further proceedings.

A separate Order will be issued.

**Date**: May 24, 2016

<u>/s/ William J. Nealon</u>
**United States District Judge**